UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Criminal Action No. 3:12-cr-132-M(1) |
| GEORGE OJONUGWA, | § § | |
| Defendant. | § § § § | |

# MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Suppress Evidence pursuant to Rules 12(b)(3)(C) and 41(h) of the Federal Rules of Criminal Procedure, and the Fourth Amendment to the United States Constitution, filed by Defendant George Ojonugwa [Docket Entry #125]. Ojonugwa seeks to suppress evidence and statements obtained after a warrantless search of a hotel room. On April 5, 2013, the Court held an evidentiary hearing on the matter. After considering the evidence presented, the parties' arguments, and the applicable law, the Court concludes that the Motion should be **DENIED** in its entirety.[1]

I. FACTS DETERMINED FROM EVIDENCE[2]

At or around 2 a.m. on February 12, 2011, Timothy Gordon, head security officer at the Le Méridien Hotel, received a radio alert from hotel personnel that an assault had occurred

---

[1] In accordance with Federal Rule of Criminal Procedure 12(d), the Court's essential findings are set forth in this Order.

[2] During the hearing, the Government introduced exhibits that included pictures of the hotel room, a police report summarizing the events that occurred, and the consent-to-search form signed by Ojonugwa. The Government also presented the following witnesses: Agent Richard Higbie with the U.S. State Department, Timothy Gordon, head security officer at the Le Méridien Hotel, Detective Stan Forney of the FBI Task Force, and Dallas Police Department Officers Stephen Cazelle, Jeff Bruckerhoff, Christopher Langlois, and Byron Guynn, all of whom were dispatched to the hotel. Ojonugwa did not present any witnesses.

minutes earlier near the hotel. Gordon learned that a black male, later identified as Eseos Igiebor, had had an altercation with a cab driver, Peter Nweke, during which Igiebor assaulted Nweke by kicking him in his thighs, punching him, and taking money from the center console of the cab.[3] Gordon learned that the suspect had fled into the hotel and boarded an elevator. The hotel's front desk personnel called the Dallas Police Department ("DPD") to report that the suspect in the assault and robbery had entered the hotel.

The Le Méridien hotel features an open atrium lobby, around which guest rooms are situated. Within the atrium are glass elevators. After being notified of the robbery and the fact that the suspect had entered into the hotel, Gordon proceeded to the second floor of the hotel to try to see the suspect. Gordon observed an elevator stop at the fifth floor, and a black male quickly exit to the right towards the north hallway. Gordon headed to the fifth floor to further assess the situation.

While walking up the north hallway of the fifth floor, Gordon heard from room 527, which was in the direction the person believed to be the suspect headed, multiple men speaking in a loud and agitated manner. Gordon inspected the remainder of the hallway for unusual activity, and finding none, he returned to the outside of room 527 to inquire of the occupants inside. Still hearing loud male voices, Gordon knocked loudly on the door and announced himself as hotel security. The voices quieted, but no one opened the door. Gordon continued to knock loudly and announce his presence, but he received no response. At about 3 a.m., Gordon returned to the elevator area.

Four or more armed officers of the DPD arrived at the hotel in response to the police dispatch. One of these officers, Officer Bruckerhoff, testified that, before checking in with

---

[3] Igiebor also assaulted a female passenger in the cab, but the evidentiary record is unclear as to whether Gordon learned of this assault before or after the police officers arrived at the hotel.

Gordon, he and the other officers had spoken with Nweke and the female passenger of his cab and learned that only one suspect was involved in the robbery and assault. Gordon discussed with the officers the sequence of events leading up to that point, emphasizing that he believed the suspect was in room 527 with other unknown individuals. Gordon expressed his concern for the safety of hotel guests and led the officers to the room. Officer Cazelle testified that pursuant to the DPD's protocol, the armed officers lined up outside of room 527 and in a nearby stairwell, with their guns drawn. At this point, the officers did not know whether the suspect was armed, whether he was a guest of the hotel, or whether he was authorized to enter room 527.

Some of the officers knocked loudly on the door to room 527, identifying themselves as the police, and directing the occupants to open the door. Officer Cazelle testified that other officers inspected rooms on the fifth floor for unusual activity, by knocking on the doors and speaking with the guests. After receiving no response from room 527, Gordon attempted to gain entry into the room using his master key, but he was unable to open the door more than a few inches because the occupants had engaged the safety latch. Gordon and the officers then again banged loudly on the door to try to gain admission. The occupants of room 527 did not respond.

According to Officer Cazelle, before the officers took further action to enter, one of the occupants of the room, Ebeneezer Legbedion, removed the safety latch, fully opened the door, and made a sweeping-like gesture with his arm, which the officers interpreted as an invitation to enter the room. Legbedion was not asked if the officers could enter the room, and Legbedion did not verbally invite the officers inside. The hotel room consisted of a separate living and bedroom area, separated by a divider wall. Not knowing if anyone was hiding behind the wall, the officers went in different directions to locate the occupants. The Court concludes based on Officer Cazelle's testimony, the officers thought it was necessary to search both sides of the wall

because someone could be hiding with a weapon waiting to ambush the officers.

The officers located Ojonugwa and Igiebor in the bedroom. Officer Cazelle and the other officers identified Igiebor as the person matching the description of the robbery suspect, and took him into custody. The two other occupants, Legbedion and Ojonugwa, were moved into the hallway, where Igiebor had been brought. While in the room, Officer Cazelle and Officer Bruckerhoff observed on a desk large stacks of paper, stacks of plastic cards that appeared to be debit/credit cards and unused gift cards on the desk, laptops, printers, and in an open safe, a significant amount of cash. Officer Langlois testified that he saw on the table a large duffel bag overfilled with gift cards and paperwork containing personal identity information of individuals other than the occupants of the room. The testifying officers stated that from the abundance of paperwork, this information was readily apparent and obvious to them without further inspection.

Suspecting criminal activity, Officer Langlois called Detective Stan Forney with the FBI Task Force Identity Theft Unit to help conduct a further investigation. Ojonugwa, Legbedion, and Igiebor were taken to the first floor hotel lobby. While walking towards the elevator, Officer Bruckerhoff overheard Ojonugwa ask Igiebor why he had to take the cab money when they already had money in the hotel room. Ojonugwa was not placed in handcuffs or otherwise physically restrained, and one of the officers handed Ojonugwa a bottle of water. Officer Langlois inquired whether Ojonugwa would be willing to consent to a search of room 527, while also informing him of his right to decline. Officer Cazelle testified that if Ojonugwa did not consent to a search of the room, the officers would have attempted to get a search warrant. While noting Ojonugwa's African accent, the officers testified that Ojonugwa appeared to understand them and that he responded to their questions in an appropriate manner. Ojonugwa

verbally consented to a search of room 527, which he memorialized in a consent form signed at 5:25 a.m. and witnessed by two police officers. Officer Guynn testified that Officer Langlois read the standard consent form aloud to Ojonugwa before he signed it, but Officer Langlois did not further explain it, except to tell Ojonugwa that he could decline consent. Ojonugwa did not limit the search of the room to any particular area or items, and never attempted to revoke his consent.

After Ojonugwa consented to the search, the officers returned to room 527. Detective Forney and his partner, Special Agent Ellis, arrived at approximately 6:00 a.m. Detective Forney gave Ojonugwa *Miranda* warnings and asked him questions regarding evidence found in the room. Ojonugwa disclaimed ownership of items in room 527 and asserted that the property belonged to Igiebor.[4] From his investigation, Detective Forney learned that room 527 was rented in the name of a third-party—Nathaline McGill—but that person was neither an occupant nor renter of the hotel room. McGill told Detective Forney that she believed someone had stolen her identity at a party in Dallas in or about December 2010. The evidence during the hearing revealed was that Ojonugwa, along with another person, rented the room in McGill's name. The police report stated that the occupants of the room said they had been staying in room 527 for approximately ten days. *See Def.'s App.* at 47.

On August 7, 2012, Ojonugwa, along with the other occupants of room 527, were indicted. On February 1, 2013, Ojonugwa moved to suppress evidence seized from the room and statements made at the hotel.

---

[4] The evidentiary record is unclear as to whether Ojonugwa disclaimed ownership in all or some of the items in the room.

II. LEGAL ANALYSIS

Ojonugwa argues that (1) he has standing to challenge the search because he had a reasonable expectation of privacy in the hotel room; (2) there is no applicable exception to the warrant requirement; and (3) Ojonugwa's consent reflected in the form was not given voluntarily and therefore is of no effect.

A. Standing to Challenge the Search of the Hotel Room

A defendant must have a legitimate expectation of privacy in the particular area searched in order for a Fourth Amendment challenge to be assertable by him. *See Minnesota v. Carter*, 525 U.S. 83, 91 (1998); *United States v. Meyer*, 656 F.2d 979, 981 (5th Cir. 1981). The Government does not dispute, and the Court concludes, that Ojonugwa was an overnight guest in the hotel and had a reasonable expectation of privacy in room 527. *Minnesota v. Olson*, 495 U.S. 91, 99 (1990); *Stoner v. California*, 376 U.S. 483, 490 (1964).

The Government argues that Ojonugwa nevertheless does not have standing to contest the search because he disclaimed ownership of the evidence he now seeks to suppress. *Govt.'s Resp. Mot.* at 13. It is well-settled in the Fifth Circuit that "voluntarily disclaiming ownership of property before the police seize that property constitutes abandonment, thereby depriving the defendant of any legitimate expectation of privacy in the abandoned property." *United States v. Wolfe*, 983 F.2d 232 (5th Cir. 1993). *See also United States v. Cofield*, 108 F. Supp. 2d 1374, 1380 (S.D. Fla. 2000), *vacated on other grounds,* 272 F.3d 1303 (11th Cir. 2001). Abandonment, however, requires a clear renunciation of the property *before* the search occurs. *See Wolfe*, 983 F.2d 232 ("A defendant who abandons property before it is seized forfeits any expectation of privacy in the property and cannot object to its search."); *Cofield*, 108 F. Supp. 2d at 1380 ("One may also abandon property by denying ownership of the property *before* it is

searched by law enforcement officials.") (emphasis added).

Detective Forney testified that when asked about the evidence found during the consent search, Ojonugwa disclaimed ownership of it, instead claiming that the property belonged to Igiebor. The timing of Ojonugwa's disclaimer is critical to this analysis. The record before the Court demonstrates that the first time Ojonugwa disclaimed ownership was after the consent search occurred. Because Ojonugwa did not disclaim ownership of the property before the search, Ojonugwa did not abandon the property and therefore maintains standing to contest the search of the room and its contents. *See Wolfe*, 983 F.2d 232.

B. <u>Initial Consent to Enter Room 527</u>

Ojonugwa argues that the warrantless entry into room 527 is unconstitutional because the officers did not have a warrant or actual or implied consent to enter. *Def.'s Mot.* at 9–10. A search conducted pursuant to consent is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). The government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997).

The voluntariness of consent is determined from the totality of the circumstances surrounding a search. Relevant factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *See United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988) (internal citations omitted). "[N]o single factor is dispositive or controlling of the

voluntariness issue." *Id.* Compliance with a police demand is generally insufficient to constitute voluntarily consent. *Bumper v. North Carolina,* 391 U.S. 543, 548–49 (1968) (finding that the Government cannot prove voluntary consent by showing no more than acquiescence to a claim of lawful authority); *United States v. Winsor*, 846 F.2d 1569, 1572, n. 3 (9th Cir. 1988) (en banc) (agreeing with the original panel that compliance with a police demand is not consent).

The Government contends that the officers had non-verbal consent from Legbedion to enter the room. In support, the Government relies on the Fifth Circuit's decision in *U.S. v. Scroggins*, 599 F.3d 433 (5th Cir. 2010). In *Scroggins*, a woman was arrested outside her home, but requested permission to enter her home to change her clothes. The officers informed her that she could enter her home only if accompanied by the officers. She agreed. Upon suspecting another person might be in the home who could pose a danger to them, the officers conducted a protective sweep. In finding consent to enter the home, the district court stated that the women "consented impliedly, if not expressly. It was her choice to decide whether to go back in the house when she knew that the officers would accompany her, and she chose to go in." *Id.* at 442. The Fifth Circuit affirmed the district court's finding of consent.

After examining the totality of the circumstances, the Court concludes that Legbedion did not consent voluntarily to the officers entering room 527. Gordon and the officers repeatedly demanded entry into the room by banging loudly on the door. The officers had their guns drawn and pointed at the door to room 527, which the occupants could have seen through two peep holes in the door. In addition, Gordon's attempt to open the door using a master key manifested his and the officers' intent to enter irrespective of whether the occupants actually consented.

The combination of the multiple loud knocks, verbal demands, armed officers, and attempt to open the door leads to the conclusion that the occupants did not perceive their

compliance with the officers' demand to open the door to be optional. *See Winsor*, 846 F.2d at 1572. The Court concludes that Legbedion's opening of the door and gesturing for the officers to come inside was in response to a police demand and not a voluntary consent for the officers to enter.

C. <u>Exigent Circumstances as a Basis to Enter Room 527</u>

The Government contends that exigent circumstances, a second exception to the warrant requirement, validates the warrantless entry into the hotel room. *Rico*, 51 F.3d at 500–501. There is no set formula for determining when exigent circumstances will justify a warrantless entry. Courts consider, among other factors:

> (1) the degree of urgency involved and amount of time necessary to obtain a warrant;
> (2) [the] reasonable belief that contraband is about to be removed;
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
> (4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008) (internal citations omitted). Circumstances giving rise to a finding of exigent circumstances include the hot pursuit of a fleeing felon, imminent destruction of evidence, a need to prevent a suspect's escape, or the risk of danger to the police or to other people inside or outside the particular location. *See Minnesota*, 495 U.S. at 100.

The Government bears the burden of demonstrating by a preponderance of the evidence the existence of exigent circumstances justifying a warrantless search. *Mata*, 517 F.3d at 287. When determining the existence of exigency, the Fifth Circuit considers "the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent

men standing in the shoes of the officers." *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996) (internal quotation omitted). The focus is on the totality of the circumstances leading up to the challenged entry. *See id.* If reasonable minds could differ, the court will not second-guess the judgment of experienced law enforcement officers concerning the risks presented by a volatile situation. *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc).

The Government argues that exigent circumstances existed in this case because the officers believed a suspect in a violent assault was in room 527, and they did not know whether he was armed and a danger to other guests of the hotel. In response, Ojonugwa contends that there were no exigent circumstances because there was no threat to safety since the suspect was inside the hotel room, the officers were not in hot pursuit, and law enforcement had no belief or reason to believe that the suspect would, or even could, flee before a warrant could be obtained.

The Court finds that the officers' entry into room 527 was based on the presence of exigent circumstances. Several of the officers, including Officer Cazelle, testified that they were concerned that the suspect did not belong in room 527 and could potentially have harmed other guests in the hotel. Gordon testified that he was concerned for the safety of hotel guests, knowing that a man had harmed someone near the hotel property and then ran into the hotel in the early morning hours. The fact that at least four armed police officers quickly arrived on the scene in the early morning evidences the officers' serious concern for the safety of hotel guests. The evidence reveals that the officers did not know whether the suspect was armed and whether he was authorized to enter room 527. The occupants' failure to allow entry into the room after Gordon and the police officers repeatedly knocked reasonably caused officers to be concerned about risks to the occupants of room 527 and guests of the hotel. The Court further notes that the officers would likely have experienced a delay in obtaining a warrant between 3 and 6 a.m. on a

Saturday during which time a possibly armed suspect in a violent assault could have injured occupants of room 527 and other guests. Walls between the hotel rooms would not have protected other guests had the suspect been armed and fired a weapon.

Admittedly, the question of exigent circumstances is a close one. The reasoning of the Fifth Circuit in the recent case of *United States v. Timoteo* supports the Court's conclusion. 353 Fed. Appx. 968.[5] In *Timoteo*, several DEA agents were at the Dallas-Fort Worth airport, waiting for the arrival of two Canadian citizens who the agents had learned planned to purchase $1 million worth of cocaine. The agents observed the two suspects leave the airport in a car driven by an unknown person. The agents followed the car to a nearby hotel, where the suspects checked in. The agents followed the driver to another hotel and began their surveillance. The two suspects were arrested later that day, attempting to purchase cocaine from an undercover agent.

After the arrest of the two original suspects, the agents arrested the driver. The agents devised a scheme to have the driver exit the hotel so they could arrest him without a warrant to enter his room. They called his room, and advised the man who answered that his car had been struck. The man who came out was not the driver, and the agents realized there must be another man in the room. Concerned that that person had seen his cohort arrested downstairs, the agents entered the hotel room without a warrant, claiming exigent circumstances because the other occupant might flee before they could obtain a warrant.

Although the agents admitted they did not know whether anyone involved in the drug conspiracy was armed, the district court found that exigent circumstances justified the agents' warrantless entry into the hotel room. In its published opinion, the district court noted that the

---

[5] Pursuant to the Fifth Circuit rules, this unpublished case is cited for its reasoning only, and not as precedent. *See* Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.

officers did not know whether the other conspirator had witnessed the arrest, whether he was armed, or whether he was destroying evidence. The officers also testified that they had earlier observed another individual in the hotel lobby, whose behavior suggested that he could be involved in the drug dealing. In affirming the district court's finding of exigent circumstances, the Fifth Circuit noted that it was "reasonable for the agents to believe that this man, alarmed when [his coconspirator] did not return, would barricade himself in the hotel room with a firearm, potentially endangering the agents and other hotel guests; attempt to destroy evidence; or attempt to flee the scene." *Id.*

Here, the facts support a conclusion that when they approached room 527, the officers were concerned about their own safety, the safety of hotel guests, and the possibility of an armed suspect inside the hotel. Fear for the safety of hotel guests was heightened because: (1) the suspect had committed a violent assault against two people only hours before and (2) it was not clear that the suspect was an authorized guest of the hotel, as he had fled into the hotel in the early morning hours after committing a violent crime. While the officers had less reason to be concerned about the suspect fleeing or attempting to destroy evidence than was the case in *Timoteo,* the danger to the general public was real and articulable. The Court concludes that the officers' warrantless entry into room 527 was based on the presence of exigent circumstances, and thus the entry did not violate the Fourth Amendment.

D.  Scope of Protective Sweep

Ojonugwa argues that even if the officers had exigent circumstances to enter room 527, the officers exceeded the scope of their authority to enter when they conducted a protective sweep of the room. The "protective sweep" doctrine authorizes officers who enter without a search warrant based on exigent circumstances to conduct a quick and limited search of the

premises to protect the safety of police officers and others at the scene. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. *Id.*; *see also United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (finding a protective sweep reasonable where police observed a firearm inside the front door of a house and heard noises near the back door of the house indicating that other persons might be present).

To be constitutionally valid, a protective sweep must meet a four-prong test: (1) the police must not have entered (or remained in) the residence illegally and their presence must be for a legitimate law enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the legitimate protective sweep may not be a full search but rather must be no more than a cursory inspection of those spaces where a person may be found; and (4) the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. *United States v. Rodriguez,* 601 F.3d 402, 405 (5th Cir. 2010). The court should consider the totality of the circumstances surrounding the officers' actions to determine whether an officer had a reasonable, articulable suspicion sufficient to justify a protective sweep. *Id.*

Here, all four prongs required for the protective sweep doctrine are met. Law enforcement officers entered the room for a legitimate law enforcement purpose, under exigent circumstances. The protective sweep was supported by a reasonable, articulable suspicion that the occupants could pose a danger to the officers or other hotel guests, as at least one of the occupants was believed to have committed a violent assault. The protective sweep was limited to a hotel room occupied by a number of persons. Officer Langlois testified that the first priority

in responding to a dispatch call is to secure the scene and create a safe environment. To secure the room, the officers spread out to check the bedroom and living area for hidden occupants. According to Officer Cazelle, the protective sweep lasted no more than three minutes, during which the officers did not open any drawers, manipulate any belongings, or leaf through any papers. The protective sweep was brief and limited to places of potential concealment. The Court concludes it lasted only as long as was necessary to dispel the reasonable suspicion of danger.

While the officers testified that they observed paperwork with social security numbers and other personal information that made them suspicious, the Court credits the officers' testimony that this information was readily apparent while a legitimate protective sweep was being conducted. The fact that the officers saw the suspicious items in plain view while conducting a protective sweep does not prevent them from investigating further as to whether a crime was being committed.

E. <u>Voluntariness of the Consent-to-Search Form</u>

Finally, Ojonugwa argues that, even if the police were constitutionally authorized to enter room 527, Ojonugwa did not voluntarily consent to the search, thus rendering inadmissible all evidence seized from the room. *Def.'s Mot.* at 9–11. When consent is considered to have validated a warrantless search, the court must examine "the totality of the circumstances to determine whether the consent was knowingly and voluntarily given." *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985). The government must prove, by a preponderance of the evidence, free and voluntary consent. *See United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997). The relevant factors to determine voluntariness are the same as those used to determine whether a consent to enter was voluntary. *See Olivier-Becerril*, 861 F.2d at 426. Again, no

single factor is dispositive or controlling of the voluntariness issue. *Id.*

Here, the application of the relevant factors causes the Court to conclude that Ojonugwa voluntarily signed the consent form. There is no evidence that the police used any coercive tactics on Ojonugwa. He was neither handcuffed nor physically restrained when he was asked whether he would consent to a search of room 527. There is no evidence that Ojonugwa lacked the intelligence or education necessary to understand the consequences of his consenting. An officer read the entire form aloud to Ojonugwa. Each of the testifying officers who talked to him stated Ojonugwa spoke English and responded appropriately to them, evidencing Ojonugwa's understanding of what they were saying. There is no evidence that Ojonugwa ever revoked his consent, or that he otherwise limited the scope of the search. The Court concludes that the consent form was signed by Ojonugwa voluntarily and therefore authorized the officers to search the contents of the room without a warrant. Because the initial entry was lawful and Ojonugwa's subsequent consent was voluntary, the Court concludes that the evidence seized from the room is admissible.

### III. CONCLUSION

In light of the foregoing, the Court **DENIES** Defendant's Motion to Suppress. Although Ojonugwa has standing to challenge the entry and search of room 527, because exigent circumstances validated the warrantless entry into room 527, a legitimate protective sweep occurred and Ojonugwa consented to the search of the room, during which evidence was seized, but not in violation of the Fourth Amendment.

**SO ORDERED.**

Dated: April 23, 2013.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS